# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL DUNKEL, *et al.*, on behalf of ) 
themselves and all others similarly situated, )

                        Plaintiffs,        )     Civil Action No. 2:13-cv-00695

v.                               )     Judge Mark R. Hornak

WARRIOR ENERGY SERVICES, INC.; and ) 
IPS, INC., )

                        Defendants.   )

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiffs, Paul Dunkel, Marlin Addison, Latrice Allen, Michael Andiorio, Thomas Ezequiel, Bryan Franklin, Keith Kozlesky, Paul Ramsey, Terry Ramsey, et al. ("Plaintiffs"), brought this civil action to recover unpaid overtime on behalf of themselves and other allegedly similarly situated employees of Warrior Energy Services Corporation ("Warrior") and Integrated Production Services, Inc. ("IPS") (collectively "Defendants") as a collective action under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA") and as a Rule 23 class action under the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. § 333.101 *et seq.* The Complaint boils down to this: the Defendants allegedly misclassified Plaintiffs (and other employees) as exempt under the Motor Carrier Exemption from the overtime requirements of the FLSA and the relevant provisions on the PMWA.

Pending before the Court is Plaintiffs' Motion for Conditional Class Certification pursuant to 29 U.S.C. § 216(b), ECF No. 50, and a Joint Motion for Approval of Court-facilitated Notice, ECF No. 85. In evaluating these Motions, the Court has carefully considered

Plaintiffs' Second Amended Complaint, ECF No. 14-1; Defendant IPS's Answer, ECF No. 21; Defendant Warrior's Answer, ECF No. 22; Plaintiffs' Motion for Class Certification, ECF No. 50, and Brief in Support, ECF No. 51; Defendants' Brief in Opposition, ECF No. 63, and related appendix, ECF No 64; Plaintiffs' Reply Brief, ECF No. 68; Defendants' Sur-Reply Brief, ECF No. 73; the Supplemental Brief in Support of the Joint Motion for Approval of Court-Faciliated Notice, ECF No. 86; Plaintiffs' Memorandum Concerning "Court Costs," ECF No. 87; Plaintiffs' Confirmation and Compilation of Current Plaintiffs, ECF No. 97; as well as all attached Exhibits and other relevant documents submitted by the parties. For the reasons that follow, the Court will grant Plaintiffs' Motion for Conditional Class Certification[1] in part and will approve the proposed Court-Facilitated Notice, as modified.

## I.    **BACKGROUND**

Plaintiffs[2] brought this action as an individual and collective action under the Fair Labor Standards Act and as a putative class action applying the Pennsylvania Minimum Wage Act to recover damages for non-payment of allegedly-due unpaid overtime wages. Plaintiffs filed their Complaint on May 17, 2013, and an Amended Complaint on August 1, 2013. ECF Nos. 1 and 9. Following Defendants' Motion to Dismiss, Plaintiffs filed a Second Amended Complaint ("SAC"). ECF No. 14-1. Although the initial Complaint listed three Defendants—Superior Energy Services, Inc., Warrior Energy Services, Inc. ("Warrior"), and Integrated Production Services, Inc. ("IPS")—the parties stipulated to the dismissal of Superior Energy Services, Inc. pursuant to Fed. R. Civ. P. 41(a)(1)(A). ECF No. 19. Defendants filed Answers to the SAC on

---

[1] This is really a misnomer. There is no "class" to be certified in a § 216(b) action. What is actually going on is the issuance of a court-approved notice to similarly situated potential "opt-in" plaintiffs.

[2] The Second Amended Complaint lists the following named Plaintiffs: Paul Dunkel, Marlin Addison, La Trece Allen, Michael Andiorio, Thomas Ezequiel, Bryan Franklin, Keith Kozlesky, Paul Ramsey, Terry Ramsey, Robert Thorpe, Steve Nelson, Sean Muse, Heath Peery, and Gary George. ECF No. 14-1, at ¶¶4–17. Since the filing of the Second Amended Complaint, several putative opt-ins have filed their consent to opt-in. *See* ECF Nos. 35, 38–44, 47–49, 52–60, 74, 92–96.

2

November 25, 2013. ECF Nos. 21–22. Following the filing of several consents to opt-in, the Plaintiffs filed a motion to "conditionally certify" the FLSA collective action and an accompanying brief on July 9, 2014. ECF No. 50–51. Defendants filed a brief in opposition on August 18, 2014, ECF No. 63, to which Plaintiffs replied on August 27, 2014, ECF No. 68. Defendants filed a sur-reply brief on September 5, 2014. The Court heard oral argument on September 29, 2014.

Count I of the Second Amended Complaint alleges that Defendants failed to pay overtime in violation of the Fair Labor Standards Act ("FLSA") pursuant to 29 U.S.C. § 216(b). Count II, which alleges a failure to pay overtime wages in violation of the Pennsylvania Minimum Wage Act, 43 Pa. Cons. Stat. § 333 *et seq.* ("PMWA"), is purportedly brought as a class action pursuant to Fed. R. Civ. P. 23. Count III of the Second Amended Complaint alleges violations of both the FLSA and the PMWA for failure to include bonuses in the calculation of regular rate of pay.[3]

In February 2012, the parent corporations of Warrior and IPS merged. ECF No. 63, at 6. Plaintiffs' lawsuit thus concerns former Warrior employees and legacy Warrior employees currently employed by IPS as the successor company. *Id.* Both Warrior (formerly) and IPS (presently) provide(d) oil field services, including, as relevant here, coil tubing services. *Id.* On March 1, 2012[4], IPS assumed operational control of Warrior's coil tubing business unit. *Id.*

---

[3] While the Complaint alleges violations of the PMWA in addition to the FLSA claims, the efforts of the Plaintiffs up to this point have centered on the FLSA portion of this action. The Motions before the Court pertain to the FLSA, and the Court will spend little time discussing the PMWA Rule 23 class action portion of the lawsuit in this Opinion.

[4] The Declarations of the Plaintiffs indicate that the merger took place in August 2012. *See, e.g.*, the Declaration of Heath Peery, ECF No. 51-1, at ¶10 (stating that "Warrior and IPS merged in about August 2012, and I then became an employee of IPS"). It is unclear at this point what difference, if any, this discrepancy in the merger date has on the outcome of this portion of the proceedings. Neither party has indicated that it would affect the issues addressed here.

3

Coil tubing involves using large lengths of coiled tubing to stimulate the production of oil and gas in wells and to clean out oil and gas wells. ECF No. 64-1, at ¶4. Most of the work performed by coil tubing crews for the Defendants involves drilling out plugs in well casings that are left by the companies that perform "fracking."[5] ECF No. 51-1, at ¶5. Although drilling out plugs is the primary job of the coil tubing crews, they also occasionally perform preparatory work to get the wells ready for fracking and are also sometimes called out to well sites to help retrieve equipment and tools that other companies may have lost in the wells. ECF No. 51-1, at ¶6. A given well site may have between 2 and 10 wells, and each well may have between 10 and 40 plugs. ECF No. 64-1, at ¶9.

To perform these tasks, the Defendants used coil tubing crews that normally consisted of 5 workers: a ground hand, a pump/coil hand, a pump operator, a coil operator, and a supervisor. ECF No 51-1, at ¶15. Each crew was based out of a coil tubing district (or "shop"). *Id.* at ¶11; *see also,* ECF No. 64-1, at ¶¶6–7. According to the Declaration of Michael Davis, submitted by Defendants, from the years 2010 to 2013, the Defendants had the following ten coil tubing districts: (1) Belle Vernon, Pennsylvania; (2) Williamsport, Pennsylvania; (3) Dickinson, North Dakota; (4) Laurel, Mississippi; (5) Odessa, Texas; (6) Longview, Texas; (7) Victoria, Texas; (8) Arcadia, Louisiana; (9) Broussard, Louisiana; and (10) Decatur, Texas.[6] ECF No. 64-1, at ¶7.

---

[5] The hydraulic fracturing of shale to release gas or oil.

[6] Some of the Declarations submitted by Plaintiffs indicate that they worked out of "shops" not mentioned in the list provided by Defendants. Other Plaintiff Declarations, however, assert that only two Pennsylvania shops existed. For example, the Declaration of Heath Perry states, "I reported out of the Belle Vernon, PA shop, one of two shops in PA (the other one being in Williamsport, PA) . . . ." ECF. No. 51-1, at ¶11. On the other hand, Brian Franklin mentions in his Declaration that, in addition to the two Pennsylvania shops already listed, he also worked in a shop located in Clarks Summit, PA. ECF No. 51-3, a ¶10. This point is clarified in a deposition transcript appended to Plaintiffs' Reply brief in which Brian Franklin explains that the Clarks Summit shop is a "further extension of the Williamsport location." ECF No. 68-2, at 22. He further explains, "We just had a pilot location set up two hours northeast of the Williamsport yard, so that we could service Cabot and companies that were up in that location, so we could be a little more efficient getting to them." *Id.* Thus, to the extent that a Clarks Summit, PA location existed, it can be considered as coming under the umbrella of the Williamsport, PA shop.

From these districts, coil tubing crews would work at well sites in the surrounding areas, including other states. For example, as explained in his Declaration, Keith Kozlesky reported out of two shops/districts—Belle Vernon, Pennsylvania and Williamsport, Pennsylvania—but worked at well sites in Pennsylvania, Ohio, and West Virginia. ECF No. 51-4, at ¶¶9–10. Robert Knowles, another Plaintiff, reported out of three shops/districts—Belle Vernon, Pennsylvania; Williamsport, Pennsylvania; and Decatur, Texas—but worked at well sites in eight states: Pennsylvania, Texas, West Virginia, Ohio, New York, Oklahoma, Louisiana, and New Mexico. ECF No. 51-6, at 3–4. Plaintiffs did not submit Declarations from anyone who worked out of the following seven (7) Districts: Dickinson, North Dakota; Laurel, Mississippi; Odessa, Texas; Longview, Texas; Victoria, Texas; Arcadia, Louisiana; and Broussard, Louisiana.[7] Crews were required to report to the shops/districts (such as Belle Vernon or Williamsport) before their shift began and then travel to the well site from there. ECF. No. 51-2,

---

Chris Sittard alleges in his Declaration that he worked out of shops in Clarks Summit, PA and Cranberry, PA, in addition to the Belle Vernon, PA and Williamsport, PA shops. ECF No. 51-2, at ¶10. The details Plaintiffs provided about the Cranberry, PA shop are scant. Is it perhaps an extension of another shop? Or, here's another possible explanation: Chris Sittard worked for the Defendants until "July or August 2013," which is more than six months beyond the time period that the parties have stipulated is the relevant period covered by the Notice (defined in the parties' joint proposed Notice as "between September 29, 2011 and on or about January 1, 2013, by which time Defendants were paying the former Warrior coil tubing field crew members an hourly rate of pay, plus overtime), ECF No. 85-1, at 2. So perhaps a new Cranberry, PA "shop" was founded between January 1, 2013 and August 2013. Whatever the explanation, Plaintiffs need to demonstrate on the record that Chris Sittard (or another Plaintiff) actually worked at a Cranberry, PA "shop" during the relevant time period set out in the Notice.

Finally, Robert Thorpe adds to the mix by stating that he worked out of a shop in Wooster, Ohio, ECF No. 51-5, at ¶10, which is not mentioned in the list of ten (10) districts provided by Defendant. Of course, Robert Thorpe's time at the Wooster, Ohio shop is not pertinent here because, as the Declaration makes clear, Thorpe worked there only after he returned to IPS in 2013, id., which, as noted, is outside of the relevant time period according to the parties' stipulation, ECF No. 85-1, at 2.

[7] For clarity's sake, the relevant "shops" listed by Plaintiffs in their various Declarations are as follows: Belle Vernon, PA; Williamsport, PA (including Clarks Summit, PA); Cranberry, PA (if Plaintiffs place competent evidence on the record demonstrating that one of the Plaintiffs worked at such a location during the relevant time period); and Decatur, TX. Because Plaintiffs have placed evidence on the record (in the form of Plaintiff Declarations) as to employees who worked out of shops in these locations, the authorization for notice will extend to coil operators who worked out of these shops.

at ¶¶37–38. If the well site was too far from the District, the crews would set out from the hotel where they were staying. *Id.* at ¶37.

According to Plaintiffs, coil tubing crews "had one common objective: meet the needs of the customer," which "required every member of the coil tubing crew to do whatever tasks they were qualified to perform that were required at any given time, whether those tasks officially fit any job title or not. . . ." ECF No. 51-2, at ¶¶24–25. The coil tubing operation involved several large pieces of equipment (a coil unit, a fluid pump, a crane, a blow-out protector truck, and a nitrogen truck), all of which are commercial vehicles with a gross vehicle weight rating ("GVWR") of more than 10,000 pounds. ECF No. 51-1, at ¶24. Each coil tubing operation also made use of one or more smaller vehicles (an F-150 or F-250 truck), which, in many cases, would have a GVWR of 10,000 or less. ECF No. 51-2, at ¶27.[8] This is known as a spread of vehicles. *Id.* at ¶29.

The larger pieces of equipment were either driven to well sites on their own or mounted on flat beds and hauled by tractors, and then once these bigger pieces of equipment reached the well site, they remained there until the job was completed. ECF No. 51-2, at ¶¶30, 32. The smaller vehicles (the F-150 and F-250 trucks) were driven regularly to and from the well site. *Id.* at ¶33. According to Plaintiffs, the smaller vehicles "were an indispensable part of the coil tubing operation on the sites and of the crew being able to do its job." *Id.* at ¶34. Plaintiffs allege that smaller vehicles were necessary (1) to transport the coil tubing crews back and forth to the site every day; (2) to make "fuel runs" offsite to get diesel fuel (which was not normally stored on site) for the on-site operating equipment; and (3) to make "hotshots," which were trips

---

[8] The distinction is critical because, as will be explained later in this Opinion, the FLSA's overtime provisions do not apply to operators of certain vehicles that weigh more than 10,000 pounds, but the provisions do apply to operators of vehicles that weigh 10,000 pounds or less. The overtime dispute that is central to this case is based on the weight of the vehicles used by the Plaintiffs in the performance of their job duties while employed by the Defendants. ECF No. 14-1, at ¶¶51–56.

to haul supplies and repair parts (such as chemicals needed during coil tubing to reduce friction, absorbent to clean up spills, gloves, overalls, earplugs, hardhats, safety glasses, towels, trash bags, cleaning fluids, and so on) and also to get food for crew members. *Id.* at ¶¶35, 48–50, 55–56. Furthermore, "every one in the crew was required, as necessary and as ordered, to drive the smaller vehicles," and "the smaller vehicles were regularly used by any and all of the crew members." *Id.* at ¶¶45, 47.

The workers' job titles—"whether a so-called ground hand, coil or pump hand, pump operator, coil operator or any other crew member title"—did not matter when it came to making trips in smaller vehicles. *Id.* at ¶58. The declarations also allege a high frequency of smaller vehicle use: "I drove the smaller vehicles on average some 10 or more times each week when I was a coil operator"; "There was not a week that I was on site that I can recall not driving one of the smaller vehicles off site"; "I drove the smaller vehicles many more times per week, and many more times over the course of the time I was a crew member before becoming a Supervisor, than I drove the big rigs (the commercial vehicles)"; "In fact, there were many weeks I did not drive any of the big rigs: but there wasn't a single week I can remember when I was assigned to a coil tubing crew that I didn't drive one of the smaller vehicles." *Id.* at ¶¶64, 66–68.[9]

The Plaintiffs allege that they worked an average of 100 hours per week when assigned to gas sites, working nearly every day for approximately 28 days (and sometimes more). *Id.* at ¶83–85. These crew members were paid salaries, *see, e.g.*, ECF No. 51-1, at ¶¶72–73, were given a daily on-site bonus, *see, e.g.*, ECF No. 51-3, at ¶78, and were not paid overtime, ECF No. 51-2, at ¶¶71–82. Plaintiffs allege that Defendants' failure to pay them overtime (both for hours worked in excess of 40 each week and inclusive of on-site bonuses) violated the FLSA.

---

[9] Many of the other Declarations make the same or similar allegations, often in the exact language as quoted. It is unnecessary to cite to these boilerplate provisions in other declarations as they add little (if anything) to the quoted Declaration.

ECF No. 51, at 7. They allege as the basis for Defendants' violation a misclassification of Plaintiffs as exempt under the Motor Carrier Exemption to the FLSA. *Id.* Plaintiffs argue that certain changes in the statutory scheme (as will be explained hereafter) have produced the following result:

> The hours of service of drivers, drivers' helpers, loaders, and mechanics or vehicles weighing 10,000 lbs. or less GVWR ("small" vehicles) no longer remain unregulated after SAFETEA-LU TCA[10], and these employees (such as Plaintiffs and the putative class) are not to be disqualified from overtime protection under the FLSA merely because they also perform tasks that affect the safety of "commercial" vehicles (vehicles over 10,000 lbs. GVWR) operating in interstate commerce.

*Id.* at 9. According to Plaintiffs, there are more than 500 former Warrior coil tubing employees who were employed by Defendants during the relevant time period and were affected by this alleged misclassification under the MCA. *Id.* at 6–7.

## II.   MOTION FOR "CERTIFICATION"

### A. Legal Standard

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract" and "gives employees the right to bring a private cause of action on their own behalf and on behalf of other employees similarly situated for specified violations of the FLSA," which is known as a "collective action." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013) (internal quotation marks omitted). The Third Circuit has explained that "[i]n deciding whether a suit brought under § 216(b) may move forward as a collective action, courts typically employ a two-tiered analysis." *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 195 (3d Cir. 2011), *rev'd on other grounds sub nom. Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013). More recently, the Third Circuit explained the two-step FLSA certification process as follows:

---

[10] SAFETEA-LU TCA stands for the Safe, Accountable, Flexible, Efficient Transportation Equity Act: Legacy for Users Technical Corrections Act.

Courts in our Circuit follow a two-step process for deciding whether an action may properly proceed as a collective action under the FLSA. Applying a fairly lenient standard at the first step, the court makes a preliminary determination as to whether the named plaintiffs have made a modest factual showing that the employees identified in their complaint are similarly situated. If the plaintiffs have satisfied their burden, the court will "conditionally certify" the collective action for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery. At the second stage, with the benefit of discovery, a court following this approach then makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff. This step may be triggered by the plaintiffs' motion for "final certification," by the defendants' motion for "decertification," or, commonly, by both. If the plaintiffs succeed in carrying their heavier burden at this stage, the case may proceed on the merits as a collective action.

*Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013) (internal citations and quotation marks omitted).

A plaintiff's burden at the first tier is light, requiring only that the plaintiff make a "modest factual showing" by "produc[ing] some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Symczyk*, 656 F.3d at 195. If the Plaintiff makes this modest factual showing, "the court will conditionally certify the collective action for the purposes of notice and pretrial discovery." *Id.* at 192. Put differently, the first stage looks at "whether 'similarly situated' plaintiffs do in fact exist, while at the second stage, the District Court determines whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 n.4 (3d Cir. 2012) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010)) (internal quotation marks omitted). As the *Zavala* Court explained:

"conditional certification" is not really a certification. It is actually the district court's exercise of its discretionary power, upheld in *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, (1989), to facilitate the sending of notice to potential class members, and is neither necessary nor sufficient for the existence of a representative action under the FLSA.

*Id.* at 536 (internal citations, quotation marks, and alterations omitted).

9

## B. Discussion

### 1. Is "Conditional Certification" Proper Here?

At this stage of the proceedings, the Court must make a preliminary finding as to whether the other employees described in the Plaintiff's Motion for Conditional Certification can be provisionally categorized as "similarly situated" to a Plaintiff. The Court will look to whether the Plaintiffs have put forth some evidence, beyond speculation, of a factual nexus between the manner in which Defendants' alleged policy of misclassifying employees as exempt under the MCA (but still requiring employees to regularly drive vehicles weighing *less* than 10,000 pounds, activity that would not be exempt under the MCA) affected the Plaintiffs and the manner in which it affected other employees (the potential recipients of opt-in notices). If the Court is satisfied that other similarly situated employees do in fact exist, then the collective action is appropriately "certified," i.e., notice is authorized.

The Court notes at the outset that it is not to consider the disposition of the merits of the claims. *See Bonds v. GMS Mine Repair & Maint., Inc.*, No. 13-1217, 2014 WL 2957394, at *4 (W.D. Pa. July 1, 2014) ("As a threshold matter, the Court notes that it does not consider the merits of the claim(s), decide credibility issues or resolve factual disputes at this stage of the case."). Nevertheless, it is necessary to look at what the claims are in order to decide whether other employees are "similarly situated" for the purposes of notice. The claims hinge on the classification of coil tubing employees as "exempt" under the Motor Carrier Exemption to the FLSA. Some background in the legal framework is necessary to establish exactly how the exemption is the basis of those claims.

As both parties explained in their briefs, four federal statutes provide the framework for Plaintiffs claims: (1) the FLSA, (2) the MCA, (3) the Safe, Accountable, Flexible, Efficient Transportation Equity Act: Legacy for Users ("SAFETEA-LU"); and (4) the SAFETEA-LU

Technical Corrections Act (the "TCA"). Over the years, Congress has attempted to divide jurisdiction over these matters between the Department of Labor ("DOL") and the Department of Transportation ("DOT"). The FLSA establishes the baseline rule that employees are owed "one and one-half times" their regular rates for work performed in excess of 40 hours per workweek. 29 U.S.C. § 207(a)(1). The MCA provides one exemption to this baseline rule for "any employee with respect to whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). The MCA provides that "[t]he Secretary of Transportation may prescribe . . . maximum hours of service of employees of . . . motor carrier[s] and . . . motor private carrier[s]." 49 U.S.C. § 31502(b)(1), (2).

SAFETEA-LU and the later-enacted TCA alter the scope of the MCA exemption. SAFETEA-LU, enacted in 2005, amended the MCA's definition of "motor private carrier" to mean "a person, other than a motor carrier, transporting property by commercial motor vehicle (as defined in section 31132)." 49 U.S.C. § 13102(15)(2005). Section 31132 defines a "commercial motor vehicle" as one that "has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater." 49 U.S.C. § 31132(1)(A). As a result, after the SAFETEA-LU, drivers of vehicles with a GVWR of less than 10,001 pounds could be outside the scope of the MCA exemption and thus subject to the baseline rule under the FLSA. In 2008, Congress passed the TCA, which replaced SAFETEA-LU's reference to "commercial motor vehicle" with the phrase "motor vehicle," thus restoring the MCA's pre-SAFETEA-LU definition of a motor carrier. 49 U.S.C. § 13102(15). The TCA also provides that an employee may still qualify for overtime pay under the FLSA if the employee is a "covered employee," meaning an employee whose work is defined as "affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or

11

foreign commerce" or "who performs duties on motor vehicles weighing 10,000 pounds or less." Pub. L. 110-244, Title III, § 306, 122 Stat. 1572, 1621 (2008). "Therefore, the overtime-pay provision of § 207 applies to vehicles with a GVWR of 10,000 pounds or less." *McCall v. Disabled Am. Veterans*, 723 F.3d 962, 966 (8th Cir. 2013).

As noted earlier, the Plaintiffs say that this means:

> The hours of service of drivers, drivers' helpers, loaders, and mechanics of vehicles weighing 10,000 lbs. or less GVWR ("small" vehicles) no longer remain unregulated after SAFETEA-LU TCA, and these employees (such as Plaintiffs and the putative class) are not to be disqualified from overtime protection under the FLSA merely because they also perform tasks that affect the safety of "commercial" vehicles (vehicles over 10,000 lbs. GVWR) operating in interstate commerce.

ECF No. 51, at 9. As explained by one court, "[n]otwithstanding the MCA Exemption, under the TCA, the FLSA's overtime provisions now apply to any 'covered employee' as defined in section 306." *Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 692 (S.D. Tex. 2012), *aff'd*, 755 F.3d 279 (5th Cir. 2014). "In substance, under the TCA, an employee of a motor carrier or motor private carrier . . . who works with 'non-commercial motor vehicles' defined as vehicles weighing 10,000 pounds or less may now be entitled to overtime compensation." *Id.* at 693.

Plaintiffs assert that they have established that they are similarly situated to other employees of Defendants. In order to demonstrate this, they must make a "modest factual showing" that there is "a factual nexus between the manner in which the employer's alleged policy affected [Plaintiffs] and the manner in which it affected other employees." *Symczyk*, 656 F.3d at 195. In other words, Plaintiffs must show three things: (1) an employer policy, (2) that affected the Plaintiffs in a particular way, and (3) that also affected other employees in a similar way.

12

The employers' alleged policy in this case was to deny employees overtime under a blanket MCA exemption when, in reality, the employees should have been paid overtime for the periods of time that they drove the smaller vehicles. That policy allegedly affected the named Plaintiffs by denying them overtime they would otherwise have earned. The Declarations describe working conditions in which Plaintiffs frequently drove smaller vehicles (by transporting crews to and from work, by making fuel runs, and by making "hot shots" to get supplies) and were not paid overtime:

> "I drove the smaller vehicles on average some 10 or more times each week when I was a coil operator"; "There was not a week that I was on site that I can recall not driving one of the smaller vehicles off site"; "I drove the smaller vehicles many more times per week, and many more times over the course of the time I was a crew member before becoming a Supervisor, than I drove the big rigs (the commercial vehicles)"; "In fact, there were many weeks I did not drive any of the big rigs: but there wasn't a single week I can remember when I was assigned to a coil tubing crew that I didn't drive one of the smaller vehicles."

ECF No. 51-2, at ¶¶64, 66–68.

The Declarations allege that other employees working out of the same shops/districts as the Plaintiffs were all affected in a similar manner. For example, the Declaration of Roderick Knowles explains that he worked with over 20 coil tubing crews during the years he worked for Defendants and that "[t]he coil tubing crews I worked with . . . normally consisted of five (5) workers: a ground hand, a pump/coil hand (who would be training as a pump or coil operator), a pump operator, a coil operator and a supervisor." ECF No. 51-6, at ¶6. Mr. Knowles, who worked out of three distinct shops/districts and in eight (8) states (Pennsylvania, Texas, Louisiana, North Dakota, Oklahoma, West Virginia, Ohio, and New York), claims that the working conditions (consistent required use of smaller vehicles) and the method of calculating wages (salary and bonus but no overtime for the entirety of the time working for Defendant

13

Warrior and part of the time employed by Defendant IPS) were the same in every shop/district and state in which he worked. *Id.* at ¶¶ 6–7, 40, 52, 63.

Defendants, recognizing that "it is premature at this stage for the Court to delve into questions of whether Plaintiffs or other employees are entitled to overtime compensation pursuant to the TCA," argue nevertheless that conditional certification is improper because "the experience of Warrior coil tubing employees with respect to small vehicles was substantially dissimilar week-by-week, person-by-person, crew-by-crew, District-by-District and position-by-position" and, as such, an "evaluation of whether Warrior employees qualified for overtime compensation in light of the TCA cannot be accomplished on a collective basis." ECF No. 63, at 10, 18. The Defendants further argue that collective action notice is improper because the Court would have to analyze individualized and fact-specific defenses. *Id.* at 19.

Plaintiffs counter that Defendants' arguments about the individualized assessments of how much time each coil tubing employee spent driving the smaller vehicles are to be addressed at a later stage in the litigation, not now. Plaintiffs argue that "stage two" of the collective action process is the time when the Court should engage in such intricate assessments. *See Zavala*, 691 F.3d at 537 (finding that, at the second stage, "plaintiffs must demonstrate by a preponderance of the evidence that members of a proposed collective action are similarly situated in order to obtain final certification and proceed with the case as a collective action").

The Court concludes that the Plaintiffs have met their modest burden in demonstrating that other similarly situated employees exist, that is, employees who were affected similarly to the named Plaintiffs by the Defendants' alleged violation of the FLSA. After all, the "initial determination usually results in conditional certification." *Chung v. Wyndham Vacation Resorts, Inc.*, No. 14-490, 2014 WL 4437638, at *2 (M.D. Pa. Sept. 9, 2014). The reason for this is that "should further discovery reveal that the named positions, or corresponding claims, are not

substantially similar the defendants will challenge the certification and the court will have the opportunity to deny final certification." *Id.* While it may turn out to be true that the exact determination of uncompensated overtime hours will require the Court to make individual assessments of how often each employee drove the smaller vehicles while working on coil tubing operations, and in which work weeks, it would be inappropriate to deny conditional "certification" now on that basis. Plaintiffs are required only to demonstrate that Defendants' policy affected Plaintiffs and other potential opt-ins in the same manner. Plaintiffs have surely done this. The Declarations, boilerplate-like as they are, along with the submitted deposition testimony, show that the coil tubing employees working out of the specific shops/districts listed were all affected in similar ways, albeit perhaps in differing amounts week to week. The Declarations, as quoted previously in this Opinion, state that every member of a coil tubing crew was required to (and did) drive vehicles weighing 10,000 or less on a regular basis (often more than they drove the commercial vehicles) and that the Defendants failed to pay them overtime compensation as required under the FLSA. This is sufficient to meet the "modest factual showing" standard established by the Third Circuit for FLSA notice. Whether the case will ultimately be "decertified" at "stage two" is a question for another day.

### 2. What is the Scope of Notice?

Having concluded that authorization for notice is proper, the Court must now determine its scope. The Plaintiffs have shown that other similarly situated employees of the Defendants exist, but where do they exist? The Court concludes that the Plaintiffs have demonstrated that, for the purposes of notice, similarly situated employees can be found in the shops/districts where any of the Declarants worked. Under that standard, the Plaintiffs have established that similarly situated employees are those who worked out of shops/districts in Belle Vernon, Pennsylvania; Williamsport, Pennsylvania (including the related location of Clarks Summit, Pennsylvania);

15

Cranberry, Pennsylvania (provided Plaintiffs place competent evidence in the record demonstrating that one of the Plaintiffs worked at such a location during the relevant time period); and Decatur, Texas.

The key point in this determination is where the employees worked "out of"—not where they travelled to in order to perform work for clients. According to the Declarations, at least 12 crews worked out of a given shop/district. *See id.* at ¶12. From the shop/district, the crews would head out to client locations in a variety of states. *See, e.g.,* ECF No. 51-4, at ¶¶31–33. But nothing the Plaintiffs have put in the record suggests that the Defendants' alleged violations of the FLSA were in any way dependent upon the place where coil tubing work actually took place. For example, it does not seem to matter at all that Chris Sittard worked at well sites in Pennsylvania, Ohio, West Virginia, and Tennessee. Rather, it matters only that he reported out of shops/districts located in Pennsylvania. Likewise, it does not seem to matter one whit that Roderick Knowles performed work in eight (8) states. It matters only that he reported out of shops/districts located in Williamsport, Pennsylvania, Belle Vernon, Pennsylvania, and Decatur, Texas. Thus, for the purposes of the scope of the notice, the location of the shop/district is determinative, not the location of the actual job sites.

Plaintiffs argue that they have submitted sufficient evidence to support nationwide notice. The Plaintiffs assert, without any citation to anything in the record, that "contrary to Defendants' assertions, Plaintiffs have established a sufficient evidentiary basis at this juncture to conclude that the Plaintiffs are adequate representatives of the full range of job titles among the coil tubing crews, and that they can represent the coil tubing crew members elsewhere (outside of the Pennsylvania and Decatur, TX, shops)." ECF No. 68, at 21. Despite this assertion, Plaintiffs have not made a sufficient (or really any) factual showing regarding the other coil tubing shops/districts in any other parts of the United States.

16

It bears repeating what this Court has stated in the past: "while it is true that the burden of a plaintiff at the early stage of an FLSA case is light, it is not weightless." *Schwartz v. Victory Sec. Agency, L.P.*, No. 11-489, 2012 WL 4506566, at *5 (W.D. Pa. Sept. 28, 2012). The Declarants, in an attempt to establish facts they cannot show through direct evidence, make rather gauzy claims such as the following:

> I know this about the coil tubing crews in the other states (like TX, LA, and ND) because as a supervisor I was trained by Warrior / IPS about how things were supposed to be done at all Warrior/IPS locations: they were supposed to be done the same.
>
> I also frequently would talk to other Warrior/IPS supervisors about how the work was being done elsewhere (other than PA, OH, WV, or TN) and was told the coil tubing crews consisted of the same basic unit of five (5) employees, had the same objective of having at least two pump operators and two coil operators on site at any given time, and did their work basically the same in all the states.

ECF No. 51-2, at ¶¶19–20. Other Declarations make the same claims, attempting to establish similarities between the way business was done in the shops/districts where the Declarants actually worked and the way things were done in shops/districts where they did not work, such as those in North Dakota or Louisiana. These attempts fail because the Plaintiffs have offered little more than a combination of hearsay, guesswork, and enthusiastic hopefulness to support their assertions. The Court concludes that Plaintiffs have failed to carry their light burden with respect to these other shops/districts.

Plaintiffs' failure in this regard is also buttressed by evidence submitted by the Defendants, specifically the Declaration by Phillip Avery. ECF No. 64-2. That Declaration reveals that Mr. Avery has held a variety of positions for the Defendants in the Dickinson, North Dakota shop/district. *Id.* at ¶2. It appears to demonstrate that the specific working conditions performed out of that North Dakota shop/district varied in a significant way from the conditions alleged in Plaintiffs' Declarations—namely, these coil tubing crews rarely used vehicles that weighed 10,000 pounds or less. For example, the coil tubing crews working out of the

Dickinson, North Dakota shop/district typically had fuel vendors that would come to well sites and fill the equipment with fuel. *Id.* at ¶15. Customers used independent vendors because the Defendants' markup on fuel was 20%. *Id.* Furthermore, the Avery Declaration explains that driving vehicles weighing 10,000 pounds or less was not within the job description of coil tubing employees who worked from Dickinson, North Dakota and was not part of their regular duties in the normal course of business. *Id.* at ¶16. Given this record evidence submitted by Defendants, coupled with the lack of evidence submitted by Plaintiffs regarding the conditions of work in other shops/districts, the Court concludes that Plaintiffs have failed to meet their modest burden with respect to those other locations. The scope of the collective action is therefore limited to employees who worked in the shops/districts at: Belle Vernon, Pennsylvania; Williamsport, Pennsylvania (including Clarks Summit, Pennsylvania); Cranberry, Pennsylvania (provided that Plaintiffs place competent evidence in the record demonstrating that one of the Plaintiffs worked at such a location during the relevant time period); and Decatur, Texas.

### III.  NOTICE

"The Supreme Court has held that district courts have broad discretion under FLSA to facilitate notice to potential collective action plaintiffs." *Bath v. Red Vision Sys., Inc.*, No. 13-02366, 2014 WL 2436100, at *7 (D.N.J. May 29, 2014) (citing *Hoffmann–La Roche v. Sperling*, 493 U.S. 165, 169 (1989)). "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative." *Hoffmann-La Roche*, 493 U.S. at 172.

At oral argument, the Court instructed the parties to meet and confer about the possibility of reaching a tolling agreement and about implementing potential improvements to the form and content Plaintiffs' Notice of collective action.

18

## A. Tolling Agreement

On October 21, 2014, the parties filed a joint motion for entry of a stipulated order regarding tolling. ECF No. 81. Thereafter, the Court granted the Motion:

> For the purposes of this action only, the parties have agreed to toll the running of the statutory limitations period for the FLSA claims of all putative collective action members from 9/29/14 through the later of either (a) the date on which the Court issues its decision denying [ECF No.] 50 Plaintiffs' Motion to Certify Class; or, (b) if the Court facilitates notice to putative collection action members or any subset thereof, the final day of the time period to be set by the Court for FLSA claimants to file opt-in consent forms.

ECF No. 82. Thus, the statutory limitations period will continue to be tolled, per the Court's prior Order, until the final date of the opt-in period.

## B. Who Can Join

The parties filed a joint motion for approval of court-facilitated notice, ECF No. 81, attaching the proposed notice as Exhibit 1, ECF No. 85-1. Section III of the proposed Notice, "Who Can Join," states broadly that a recipient "may be eligible to join this lawsuit if your name is on this Notice and you were hired and employed first by Warrior as a coil tubing field crew member for some or all of the time between September 29, 2011 and on or about January 1, 2013." *Id.* at 2. This portion of the proposed Notice must be modified to reflect the limitations on the scope of the collective action notice as set forth earlier in this opinion.

## C. Court Costs

The parties agree on everything in the proposed notice except for a small segment in Section IV (titled "Effects of Joining or Not Joining This Lawsuit") that warns that opt-in Plaintiffs may be liable for "court costs." That segment as proposed by Defendants would read as follows: "If Plaintiffs do not prevail, court costs and expenses may possibly be assessed against you. Plaintiffs' counsel would oppose any such recovery of costs by Defendants." *Id.* The parties also dispute the inclusion of identical language in the Opt-In Consent Form. *Id.* at 5.

Not surprisingly, Defendants would like to include this language, and Plaintiffs would like to exclude it.

The award of court costs to a prevailing defendant in an FLSA collective action is not hypothetical. *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 10-948, 2014 WL 5393182, at *1 (W.D. Pa. Oct. 23, 2014); *see Frye v. Baptist Mem'l Hosp., Inc.*, 507 F. App'x 506, 508 (6th Cir. 2012) (holding that "the district court properly found that a prevailing defendant can recover costs under the FLSA"). Courts appear to be divided on the question whether information about possible "court costs" liability should be included in a notice sent to potential FLSA opt-in plaintiffs. In *Byard v. Verizon W. Virginia, Inc.*, 287 F.R.D. 365, 374–75 (N.D.W. Va. 2012), the district court described the situation as follows:

> The authority on this question is decidedly split. On one hand, some district courts have found that "[b]eing made aware of the possibility of being held liable for [defendant's] costs of litigation is necessary information for potential plaintiffs to make an informed decision about whether to opt-in as a plaintiff." *Heaps*, 2011 WL 1325207, at *8 (collecting cases). Other district courts, however, have found that such language is "unnecessary and potentially confusing," *Sexton v. Franklin First Fin., Ltd.*, No. 08–CV–04950, 2009 WL 1706535, at *12 (E.D.N.Y. June 16, 2009), particularly given the "remote possibility" that costs will be other than *de minimus. Guzman v. VLM, Inc.*, No. 07–CV–1126, 2007 WL 2994278, at *8 (E.D.N.Y. Oct. 11, 2007); *see also id.* (such language "may have an in terrorem effect that is disproportionate to the actual likelihood that costs ... will occur in any significant degree.").

> As one district court has noted, "[a]n award of costs to a prevailing defendant in an FLSA case is clearly possible and is not merely theoretical." *Creten–Miller v. Westlake Hardware, Inc.*, No. 08–2351, 2009 WL 2058734, at *4 (D. Kan. July 15, 2009) (citing cases that have allowed costs to prevailing defendants in FLSA cases). The disclosure of this possibility will accordingly serve the overarching purposes of the notice, i.e., allowing putative plaintiffs to "make informed decisions about whether to participate." *Hoffmann–La Roche*, 493 U.S. at 170.

In support of their contention that the Notice should include reference to the possibility that opt-in plaintiffs may have costs assessed against them, Defendants point to a number of cases from around the country in which district courts have either approved such an inclusion or required that one be added to a proposed notice. *See, e.g., Wright v. Lehigh Valley Hosp. &*

*Health Network*, No. 10-431, 2011 WL 221770, at *7 (E.D. Pa. Jan. 20, 2011) (approving the addition of information about court costs in the notice and noting that "[c]ourts have awarded costs to prevailing defendants in FLSA cases and have required named plaintiffs to include information about this possibility in the notice sent to potential opt-in plaintiffs"); *Sanchez v. Sephora USA, Inc.*, No. 11-03396, 2012 WL 2945753, at *7 (N.D. Cal. July 18, 2012) (finding that "potential Plaintiffs should be made aware of any fees or costs for which they may be liable before opting in to the lawsuit"); *Harris v. Pathways Cmty. Behavioral Healthcare, Inc.*, No. 10-0789, 2012 WL 1906444, at *4 (W.D. Mo. May 25, 2012) (finding that, because "[a]n award of costs to a prevailing defendant in an FLSA case is clearly possible and is not merely theoretical" a notice "should inform prospective class members about the possibility that they may be responsible for some costs"); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 91, 98 (S.D.N.Y. 2003) (approving a notice that included language informing potential opt-in plaintiffs that they "may also be held liable for costs associated with this lawsuit, and for potential counterclaims which could be asserted against you by . . . the Defendants"); *Helton v. Factor 5, Inc.*, No. 10-4927, 2012 WL 2428219, at *6 (N.D. Cal. June 26, 2012) (holding that "the proposed notice form should be modified to include a statement explaining that potential collective action members may share in liability for payment of costs if Defendants prevail in this action").

One district court recently addressed the same issue in *Behnken v. Luminant Mining Co., LLC*, 997 F. Supp. 2d 511, 524 (N.D. Tex. 2014). The defendants in that case objected that the proposed opt-in notice did not mention that the plaintiffs would be required to pay court costs if they lost the litigation. As here, the plaintiffs countered that "adding such language would unnecessarily deter potential opt-in plaintiffs from joining the lawsuit." *Id.* The court reasoned as follows:

The relevant statement in the proposed notice form states, "Plaintiffs' attorneys are working on a contingency fee basis, which means that if there is no recovery, they receive no attorney's fee[s]." Ps. App. 37 (bracketed material added). This language does not apprise potential opt-in plaintiffs that they may be required to pay taxable court costs if the judgment is unfavorable to them. Thus the proposed notice form is not completely accurate as to the potential liabilities for those who join the lawsuit, it omits information that would be necessary for someone to make an informed decision about whether to join the lawsuit, and the affirmative representation that plaintiffs' attorneys are working on a contingency fee basis and that no recovery means no attorney's fees could lead a potential opt-in plaintiff to believe that there would be no risk of incurring personal costs of any kind if the litigation were unsuccessful. Accordingly, the court sustains Luminant's first objection to the extent that it directs that the proposed notice form be changed to read as follows: "Plaintiffs' attorneys are working on a contingency fee basis, which means that if there is no recovery, they receive no attorney's fees. You may, however, be required to pay your proportional share of taxable court costs if the plaintiffs receive an unfavorable decision." This modification addresses the inaccuracy in the proposed notice while simultaneously addressing plaintiffs' concern that individuals considering whether to opt-in might not be aware that such costs would be dispersed among members of the entire class.

*Id.*

Plaintiffs, on the other hand, point to a number of cases in which courts have come out exactly the other way. For instance, in *Bath* v. *Red Vision Systems, Inc.*, No. 13-02366, 2014 WL 2436100, at *7 (D.N.J. May 29, 2014), the court rejected the defendants contention that the opt-in notice should contain language about court costs, finding that "a statement in the notice that highlights the opt-in plaintiffs' discovery obligations and possibility of having to pay defense costs is unwarranted" because "[s]uch statements have the potential of chilling participation in the collective action." Similarly, in *Dilonez* v. *Fox Linen Services., Inc.*, --- F. Supp. 2d ---, 2014 WL 3893094, at *7 (E.D.N.Y. July 25, 2014), the court declined to include language about court costs and potential counterclaims. The court explained that "this district often rejects such language because it imposes an *in terrorem* effect that is disproportionate to the actual likelihood the costs or counterclaim damages will occur." *Id.* at *7 (internal quotation marks omitted). *See also Abdul-Rasheed* v. *KableLink Commc'ns, LLC*, No. 13-879, 2013 WL 6182321, at *6 (M.D. Fla. Nov. 25, 2013) ("With respect to the cable installers' potential liability for costs, the Court

concludes that a warning would undermine the FLSA's goal of encouraging full enforcement of statutory rights because the warning might dissuade people from joining the lawsuit.") (citing cases); *Carrillo v. Schneider Logistics, Inc.*, No. 11-8557, 2012 WL 556309, at *14 (C.D. Cal. Jan. 31, 2012), *aff'd*, 501 F. App'x 713 (9th Cir. 2012) (declining to include warnings about court costs in the notice to potential opt-ins because "the potential chilling effect of defendants' proposed warning outweighs the realistic likelihood that any future opt-ins would be required to pay a portion of defendants' litigation costs"); *Schwerdtfeger v. Demarchelier Mgmt., Inc.*, No. 10-7557, 2011 WL 2207517, at *6 (S.D.N.Y. June 6, 2011) ("The defendants' suggested language is not necessary, and would likely intimidate putative class members from opting into the case."); *Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 608 (W.D. Wis. 2006) (concurring with other courts that declined to require the inclusion of court costs language in the notice "because the statute is silent with respect to fee shifting for prevailing defendants and because the warning would chill participation in collective actions").

Here, Defendants argue that court costs language should be included in the notice in order to provide full disclosure to potential opt-ins: "A knowing and voluntary decision to join this case can only come with awareness of both the potential benefits and potential burdens of litigation." ECF No. 86, at 4. Plaintiffs counter that the disclosure is unnecessary because of a contingency agreement that indemnifies all current Plaintiffs in the action and would further indemnify all opt-in Plaintiffs who elected to have Mr. Chivers and Mr. Linkosky represent them. In this regard, Plaintiffs cite to *Ingram v. Coach USA, Inc.*, No. 6-3425, 2008 WL 281224 (D.N.J. Jan. 28, 2008), a case in which one district court declined to include court cost language in the notice, finding that such language was unnecessary for a number of reasons:

> First, the notice serves as a means to identify those who believe that they have been injured by the defendants' overtime policy and to give them a forum to pursue their potential claims. The decision to actually pursue the claim can be made after the opt-in

plaintiff consults with counsel and counsel advises him/her of their duties and obligations. Second, the proposed notice already states that counsel is being paid on a contingency basis, *see* Notice at Part IV, and plaintiff's counsel are obligated to explain what this means to each plaintiff. Contingency arrangements often address the topic of cost and so this will be explained to each potential plaintiff. Third, to ensure that the opt-in plaintiffs are fully advised of their rights and obligations, the Court directs plaintiff's counsel to advise each opt-in of his or her obligations before the consent form is filed, including advising the opt-in plaintiffs that they may be required to provide factual information (which may include responses to interrogatories and/or a deposition) and pay costs if the defendants prevail (assuming that the plaintiff's counsel have not decided to pay any such costs). Counsel's filing of the consent form will be deemed to reflect counsel's representation that he or she has discussed with the opt-in plaintiff identified on the form the fee arrangement, cost obligations, and requirements to provide information.

*Id.* at *8.

Plaintiffs argue in their Memorandum Concerning "Court Costs" that Plaintiffs' counsel is representing the named Plaintiffs under a contingency fee agreement that indemnifies and holds harmless the named Plaintiffs and, further, that "Plaintiffs' counsel will enter into the same agreement with any opt-in plaintiff who elects to be represented in this lawsuit by Plaintiffs' counsel." ECF No. 87, at 10. As for opt-in Plaintiffs who choose representation other than Mr. Chivers and Mr. Linkosky, Plaintiffs argue that those opt-in Plaintiffs "will be protected by the fiduciary obligations governing that attorney, including, of course, the obligation to disclose the potential risks (including potential costs) of joining the litigation." *Id.*

Based on the record before the Court, the Court is not convinced by Plaintiffs' arguments that all potential opt-in Plaintiffs will be protected from the possibility of being assessed court costs, obviating the need for some notice. Rather, this Court agrees with the cases cited by Defendants that because of the real possibility that at least some opt-in Plaintiffs could be responsible for certain court costs, some language on that topic should be included in the Notice in order to provide potential opt-in Plaintiffs with appropriate disclosure of the possible risks of

joining the lawsuit.[11]  To that end, the Court concludes that the disputed "court costs" language in the parties' Joint Motion for Approval of Court-Facilitated Notice, ECF No. 85-1, at 2, should be replaced with the following language:

> If at the end of the case the Court concludes that the Defendants were the prevailing party, the Defendants may request that the Court award courts costs to them and against the Plaintiffs in this case.  Plaintiffs could oppose any such request.  Those court costs could include fees for transcripts and printing, witness fees, certain copying costs, docket fees and the fees of any Court-appointed experts.  They could not include the Defendants' attorneys or expert fees.  Whether any such court costs would be awarded would be determined by the Court at the appropriate time.  [If you retain Mr. Chivers and Mr. Linkosky as your lawyers in this case, they have agreed that should such court costs be awarded, they and not the Plaintiffs would be responsible for paying them.]

The bracketed language will only be included if the Plaintiffs file with the Court for its examination the retention agreement they have entered into with the named Plaintiffs that so provides, and that they would extend identified language on that point to potential opt-in Plaintiffs (or otherwise satisfactorily demonstrates such to the Court).

Finally, the Court concludes that the "court costs" language should be deleted in its entirety from the Opt-in Consent Form.  ECF 85-1, at 5.  From the Court's perspective, such language is part of the "Notice" process, not the "consent" or "opt-in" process, and including it in the consent form is unnecessary and duplicative piling on.

## IV.  CONCLUSION

Because Plaintiffs have made the requisite factual showing that certain other putative opt-in plaintiffs are similarly situated, Plaintiffs' Motion for Conditional Certification is granted, but the scope of the conditional certification (i.e., notice) is limited by the actual evidence Plaintiffs submitted.  As stated in this Opinion, for the purposes of the FLSA collective action claims, similarly situated employees are those who worked out of shops/districts in Belle Vernon,

---

[11] By the same token, the language proposed by the Defendants, in its search for economy of words, is far more generic and general than the limited scope of recoverable costs under prevailing law, and would run the risk of simply being an *in terrorem* clause that could well create concern about liability for costs beyond those authorized by law.

Pennsylvania; Williamsport, Pennsylvania (including Clarks Summit, Pennsylvania); Cranberry, Pennsylvania (provided that Plaintiffs place competent evidence in the record demonstrating that one of the Plaintiffs worked at such a location during the relevant time period); and Decatur, Texas. The proposed Notice and Opt-In Consent Form must be modified to reflect that scope of the conditional certification. Finally, language about court costs in that Notice must be modified to include the language set forth in this Opinion, but the portion in brackets may only be included if Plaintiffs' counsel files the retention fee agreement demonstrating its accuracy (or otherwise satisfactorily demonstrates its accuracy to the Court). Finally, court costs language will not be included in the Opt-In Consent Form.

An appropriate Order will follow.


Mark R. Hornak
United States District Judge

Dated: December 23, 2014

cc:     All counsel of record